FILED

14 JUN 20  PM 3:48

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMPION SIGNS LLC, | CASE NO. 13-CV-196-BEN (JLB) |
| Plaintiff, | **ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| DEE SIGN CO.; BRADEN R. HUENEFELD, | [Docket No. 30] |
| Defendants. | |
| DEE SIGN CO., an Ohio corporation; and BRADEN R. HUENEFELD, an individual, | |
| Counterclaimants, | |
| v. | |
| CHAMPION SIGNS, a California limited liability company, | |
| Counterdefendant. | |

Before this Court is a Motion for Summary Judgment filed by Defendant Braden R. Huenefeld. (Docket No. 30). For the reasons stated below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This matter concerns business entities engaged in the real estate sign business. Prior to 2008, Plaintiff Champion Signs LLC (Champion) was a real estate sign

1   manufacturing business which sold real estate signs in California. (Johnson Decl. ¶3).

2   Ronald Johnson is the Treasurer for the Managing Member of Champion. (*Id.* ¶ 1).

3   Johnson acted on Champion's behalf in regards to matters relevant to this litigation.

4   (*See id.*)  Dee Sign Co. (Dee Sign) is an Ohio-based corporation which has sold real

5   estate signs since the 1960s. (Huenefeld Decl. ¶ 2).  The president of Dee Sign at all

6   relevant times has been Defendant Braden R. Huenefeld. (*Id.*)  Huenefeld is also the

7   sole member of Hotel Burnet, Ltd. (Hotel Burnet), an Ohio limited liability company.

8   (*Id.* ¶ 3).  Hotel Burnet was founded in 2002 to own the property on Allen Road (Allen

9   Road Property) where Dee Sign is located. (*Id.*)  The Allen Road Property includes a

10  127,000 square foot building with administrative offices and specialized real estate

11  sign manufacturing facilities. (*Id.*)

12  I. Forming a New Company

13       In 2008, Champion and Dee Signs agreed to form a company called Pac West

14  Signs, LLC. (Johnson Decl. ¶ 3). By the summer of 2009, the real estate sign business

15  was experiencing difficulties. (Huenefeld Decl. ¶ 4).  The real estate sign business is

16  dependent on the real estate market, which was severely impacted by economic

17  problems. (*Id.*)  In 2009, the parties decided to form a new company, Dee Sign USA,

18  LLC (the Company) that would operate on a national level. (Johnson Decl. ¶ 4;

19  Huenefeld  Decl. ¶ 5).  The Operating Agreement is dated November 16, 2009.

20  (Huenefeld Decl. ¶ 5, Ex. A).

21       When negotiations to form the Company began to take place, Dee Sign was

22  leasing the Allen Road Property from Hotel Burnet pursuant to a June 20, 2006

23  agreement (the "First Amendment"). (*Id.* ¶ 6, Ex. B). The First Amendment provided

24  for base rent of $727,200.00 ($5.73 per square foot) for the period of July 1, 2009 to

25  June 30, 2010. (*Id.*)  It provided for base rent of $756,000.00 ($5.95 per square foot)

26  from July 1, 2010 to June 30, 2011. (*Id.*). Champion and Dee Sign agreed that they

27  would negotiate a new lease between Dee Sign and Hotel Burnet for a lower rent.

28  (Huenefeld Decl. ¶ 7; *see also* Johnson Decl. ¶ 6).

13cv196

1    Johnson hired a real estate appraiser to advise on the rent. On August 31, 2009,
2    the appraiser told Johnson that the "estimated lease rate value" was $4.87 per square
3    foot. (Johnson Depo., Ex. 22). Johnson testified at his deposition that Huenefeld
4    wanted an agreement in the "low fives" and they "split the difference and kind of went
5    from there." (Johnson Depo. at 50:6-9). Johnson stated that he felt that it was "pretty
6    close to market." (*Id.* at 50:16-17) Johnson drafted a Second Amendment to the lease
7    between Dee Sign and Hotel Burnet, using "their template." (*Id.* at 51:25-52:1). The
8    Second Amendment provided for base rent of $626,335.46 ($4.93 per square foot) for
9    November 1, 2009 to October 31, 2010; $645,125.52 ($5.07 per square foot) from
10    November 1, 2010 to October 31, 2011; and $664,479.29 ($5.23 per square foot) from
11    November 1, 2011 to October 31, 2012. (Huenefeld Decl. ¶ 8, Ex. C). The Second
12    Amendment also contained a renewal provision which allowed the Company to extend
13    the Amendment for an additional three years. If renewed, the base rent was set at the
14    "then current market rate as mutually agreed by the parties," but stated that the base
15    rent would not be less than the base rent for the period immediately proceeding the
16    renewal term. (*Id.*)

17    Following resolution of the lease terms, Champion executed an assignment
18    directing the Company to assume the Allen Road Property lease. (Huenefeld Decl. ¶ 9,
19    Ex. D). Dee Sign assigned the Second Amendment to the Company and Hotel Burnet
20    consented to the assignment. (Huenefeld Decl. ¶ 10). The Company then began to pay
21    the agreed rent to Hotel Burnet. (*Id.*)

22    The Operating Agreement for the Company provides that Dee Signs holds a 51%
23    interest, and Champion owns a 49% interest. (Huenefeld Decl., Ex. A § 3.2). Dee Sign
24    is the "Lead Manager" of the LLC and has control of day-to-day operational
25    management. (*Id.* § 7.1(b)). The Operating Agreement states that Dee Sign designates
26    Huenefeld as its "Authorized Representative." (*Id.*)
27    ///
28    ///

## II. Disagreement Over Rent for the Allen Road Property

The Company faced continuing economic challenges, and different parties proposed different solutions. Johnson proposed that Huenefeld agree to lower the rent for the Allen Road Property. (Huenefeld Decl. ¶ 11; Johnson Decl. ¶ 8). Champion asserts that the Company was paying a substantially above-market rent for most of the three-year lease term. (Opp'n at 5; Hawkins Decl., Ex. I at 7, Ex. J at 48, 67, 79)).

The Company had also assumed a separate lease in California from Dee Sign. (Johnson Decl. ¶ 7). The Company attempted to negotiate with the landlord because it did not need the space and the rent was high. (Huenefeld Depo. at 41:9-43:1; Kolks Depo. at 31:5-32:4; Johnson Decl. ¶ 7). Johnson handled the negotiations, and was able to get out of the lease and move into a new, smaller space. (Johnson Decl. ¶ 7; Huenefeld Depo. at 41:9-43:1; Kolks Depo. at 31:5-32:4).

Champion asserts that it similarly asked Huenefeld to renegotiate the lease rates for the Allen Road Property. (Opp'n at 6; Johnson Decl. ¶¶ 8-10). It asserts that the Company was paying substantially more than the market rate, and that the Company was only using about 60% of the leased space. (Opp'n at 6; Johnson Decl. ¶ 8; Hawkins Decl., Ex. I at 7, Ex. J at 48, 67, 79). Huenefeld is accused of having "refused to enter into any meaningful discussions." (Johnson Decl. ¶¶ 8-9). Champion raised the issue again in August 2012, prior to the expiration of the lease. (*Id.* ¶ 9).

The option for the renewal provision was not exercised. (Huenefeld Decl. ¶ 12). Champion asserts that Huenefeld did nothing to fix a lower rental price, and that the company continued to pay above-market rates. (Johnson Decl. ¶ 10). Since January 1, 2013, Huenefeld has leased the property to the Company on a month-to-month basis at a rate of $4.50 per square foot. (Huenefeld Decl. ¶ 12).

Champion also asserts in its Opposition that Hotel Burnet has improperly failed to refund overpayments for property taxes. (Opp'n at 8; Johnson Decl. ¶11).

///

///

## III.  Capital Call

By November 2012, Huenefeld expressed a desire to raise needed money through capital contributions from the members. (*See* Huenefeld Decl. ¶¶ 13-14). The Operating Agreement provides that the manager can make a call for each member to make an additional capital contribution to the Company.[1]  (Huenefeld Decl., Ex. A § 4.2(a)). If a "capital call" is made, and a member does not contribute, a member who does contribute has the option to either advance a loan to the Company, or buy out the membership interest of the non-paying member.  (*Id.* § 4.2(b)).

On November 27, 2012, Dee Sign formally proposed a Capital Call Notice for $150,000.00. (Huenefeld Decl. ¶ 14; Johnson Decl. ¶ 12).  Dee Sign was responsible for 51% of the contribution ($76,500.00), and Champion was responsible for 49% ($73,500.00). (Huenefeld Decl. ¶ 14).

Although the Company had capital calls in the past, this was the first formal, non-verbal capital call.  (Kolks Depo. at 53:1-20, 80:12-24; Johnson Decl ¶ 12; Hawkins Decl., Ex. G). Champion asserts that this began "intensive discussions" about the capital call and the Company's overall budget. (Johnson Decl. ¶ 12).  One of the issues discussed was the rental payment for the Allen Road Property. (*Id.*)

The due date for the capital call was extended from December 14, 2012 to December 21, 2012. (Huenefeld Decl. ¶ 14; Johnson Decl. ¶ 12).  The parties met and communicated repeatedly between December 14 and December 21 to discuss the budgetary issues and Allen Road Property lease. (*See* Huenefeld Decl ¶ 15; Johnson Decl. ¶ 12).  Johnson asserts that Huenefeld did not "raise or discuss" the possibility of a buy-out under the Operating Agreement. (Johnson Decl. ¶ 12).  Johnson asserts that this led him to believe that the parties would continue to negotiate past the December 21, 2012 deadline. (*Id.*) Johnson states that the parties did not discuss the

---

[1]The Operating Agreement appears to impose additional requirements on the capital call and the buy-out procedure.  This Court makes no findings of fact or conclusions of law with regard to the requirements of these sections, their application in this situation, or any party's compliance.

1  capital call, and focused on the budget and the Allen Road Property lease. (*Id.*)

2  Huenefeld sent Johnson an email on December 21 reminding him that the capital
3  call due date was that day. (Huenefeld Decl. ¶ 15, Ex. E; Johnson Decl. ¶ 14). Johnson
4  states that by the time he received the email, it would have been impossible to wire the
5  funds by the close of business. (Johnson Decl. ¶ 14). The email was time-stamped
6  1:11 p.m. (Huenefeld Decl., Ex. E). Huenefeld asserts that he never represented to
7  anyone that the due date would be extended further. (Huenefeld Decl. ¶ 16).
8  Huenefeld declares that he was never asked to consider an additional extension. (*Id.*)

9  Champion sent Huenefeld a letter dated December 21, 2012 concerning the
10  capital call. (*Id.* ¶ 16, Ex. F). In the letter, Johnson states that Champion "hereby votes
11  NO to the request to make an additional Capital Call." (*Id.*, Ex. F). The letter states
12  that Champion believes that a capital call is not in the best interests of the Company or
13  its members. (*Id.*) It states that Champion believes a "cost cutting approach" is better,
14  including reductions in lease payments. (*Id.*) It notes Dee Sign's lack of interest in this
15  solution, and states that it is "increasingly clear that the parties will not agree on the
16  lease payments independently." (*Id.*) It also points out that capital calls are among the
17  last dollars distributed from the Company. (*Id.*) Champion did not make a payment
18  by December 21, 2012. (Huenefeld Decl. ¶ 16).

19  Dee Sign sent Champion a Buy-Out Notice on December 26, 2012. (*Id.* ¶ 17,
20  Johnson Decl. ¶ 13). After receipt of the notice, Champion attempted to tender the
21  capital contribution. (Huenefeld Decl. ¶ 17; Johnson Decl. ¶ 13). Dee Signs and
22  Huenefeld did not agree to rescind the buy-out offer. (Johnson Decl. ¶ 13). Huenefeld
23  declares that the tender offer was rejected because the deadline had passed and the buy-
24  out procedure was underway. (Huenefeld Decl. ¶ 17). Champion asserts that the
25  Company and Huenefeld accepted the money and used it until November 2013. (Opp'n
26  at 9 (citing Johnson Decl. ¶ 13; Kolks Depo. at 58:10-14, 59:8-11, 69:14-23; Shipley
27  Depo. at 18:25-20:7, 41:22-42:18, 43:7-10)). Champion has not cooperated with
28  ///

1  efforts to determine the appropriate purchase price for its interest. (Huenefeld Decl.

2  ¶ 17).

3      Dee Sign asserts that it paid its 51% on December 10, 2012.[2] (Mot. at 7;

4  Hunefeld Decl. ¶ 14).

5  IV. The Litigation

6      The instant action was filed on January 24, 2013. (Docket No. 1). A First

7  Amended Complaint (FAC) was filed on September 16, 2013. (Docket No. 24).

8  Champion seeks a declaratory judgment against Dee Sign with regard to whether Dee

9  Sign has a right to exercise the buy-out procedure. Champion also asserted four claims

10  against Huenefeld for breach of fiduciary duty, conversion, fraudulent

11  misrepresentation, and negligent misrepresentation. It also seeks injunctive relief

12  against all defendants. Dee Sign and Huenefeld counterclaimed, seeking declaratory

13  judgment and asserting contractual claims. (Docket No. 6). On December 30, 2013,

14  Huenefeld filed the instant Motion for Summary Judgment, asking this Court to grant

15  summary judgment in his favor on the four individual claims. Champion filed an

16  Opposition on February 4, 2014. (Docket No. 32). Huenefeld filed a Reply on

17  February 11, 2014. (Docket No. 34).

18  **LEGAL STANDARD**

19      Summary judgment is appropriate when "there is no genuine dispute as to any

20  material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

21  P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In

22  considering a summary judgment motion, the evidence of the nonmovant is to be

23  believed, and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255.

24      A moving party bears the initial burden of showing there are no genuine issues

25

26      [2]The parties appear to dispute whether Dee Sign has paid its share of the capital call. Champion asserts that Dee Sign made a "shareholder loan" on December 12,

27  2012. (Opp'n at 10). Among other things, it alleges that the money was labeled a "shareholder loan" in the internal financial statements. (*Id.*) Champion points out that

28  the difference is significant, as the Company assumed loans from Dee Sign that require the bank's approval to make distributions of capital to members, but not to repay short-term loans. (*Id.* at 10 n.4).

13cv196

1 of material fact. *Travelers Indem. Co. v. Arena Grp. 2000, L.P.*, No. 05-cv-1435, 2007
2 WL 4170421, at *5 (S.D. Cal. Nov. 20, 2007) (citing *Celotex Corp. v. Catrett*, 477
3 U.S. 317, 323 (1986)). It can do so by negating an essential element of the non-moving
4 party's case, or by showing that the non-moving party failed to make a showing
5 sufficient to establish an element essential to that party's case, and on which
6 the party will bear the burden of proof at trial. *Id.* The burden then shifts to the non-
7 moving party to show that there is a genuine issue for trial. *Id.*

8          The moving party must support their assertion that a fact is not subject to
9 genuine dispute by either a) citing to materials in the record, such as depositions,
10 documents, electronically stored information, affidavits or declarations, stipulations,
11 admissions, interrogatory answers, or other materials; or b) showing that the materials
12 cited do not establish the absence or presence of a genuine dispute, or that an adverse
13 party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c)(1).
14 To survive summary judgment, a plaintiff must set forth non-speculative evidence of
15 specific facts, not sweeping conclusory allegations. *Cafasso, U.S. ex rel. v. Gen.*
16 *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted).

17          On a motion for summary judgment, a party does not necessarily have to produce
18 evidence in a form that would be admissible at trial, as long as the requirements of
19 Federal Rule of Civil Procedure 56 are met. *Fraser v. Goodale*, 342 F.3d 1032, 1036-
20 37 (9th Cir. 2003) (citation omitted). Where material cited to support or dispute a fact
21 cannot be presented in a form that would be admissible in evidence, a party is permitted
22 to object. FED. R. CIV. P. 56(c)(2). Affidavits or declarations used to support or oppose
23 a motion must be made on personal knowledge, set out facts that would be admissible
24 in evidence, and show that the affiant or declarant is competent to testify on the matters
25 stated. FED. R. CIV. P. 56(c)(4).

26          "Only disputes over facts that might affect the outcome of the suit under the
27 governing law will properly preclude the entry of summary judgment. Factual disputes
28 that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. As

1   a general rule, the "mere existence of a scintilla of evidence" will be insufficient to
2   raise a genuine issue of material fact; there must be evidence on which the jury could
3   reasonably find for the non-moving party. *Id.* at 252.

4       A moving party is only entitled to summary judgment where it has shown that
5   there are no genuine issues of material fact, even if the nonmoving party does not offer
6   materials in support of its opposition. *Henry v. Gill Indus. Inc.*, 983 F.2d 943, 950 (9th
7   Cir. 1993).  Summary judgement is inappropriate where the movant's papers are
8   insufficient to support that motion or on their face reveal a genuine issue of material
9   fact. *See id.*

10      The parties agree that Ohio's substantive law applies to Champion's claims
11  against Huenefeld. (Mot. at 9-10); (*See* Opp'n at 12-16).

12                                    **DISCUSSION**
13  I. Fiduciary Duty
14      A. Allegations
15      Champion alleged in the Complaint that Huenefeld owes fiduciary duties to
16  Champion and the Company due to his role as Lead Manager and Member of the
17  Company. (FAC ¶ 30). It asserted that these duties include the duty of loyalty, the
18  duty of good faith, the duty to act with inherent fairness, and the duty to avoid any
19  conduct adverse to Champion's or the Company's interests. (*Id.*) It further alleged that
20  Huenefeld owes Champion an enhanced duty of utmost good faith, loyalty and honesty,
21  akin to that which partners owe in a partnership.[3] (*Id.* ¶ 31). It alleged that Huenefeld
22  owes these duties because he "specifically represented to Champion that Champion
23  could repose its trust in him to ensure Champion's and [Company]'s interests were
24  protected, and Champion did in fact place its trust in Huenefeld." (*Id.* ¶ 32).

25      Champion asserted that Huenefeld breached his duties by, "among other things,"
26  refusing to renegotiate the rental lease in Ohio. (*Id.* ¶ 33). It further claimed that he
27  wasted company assets by, "among other things," paying above-market prices for the
28  
_____

[3]Champion does not reiterate or defend this contention in its Opposition.

13cv196

1   Allen Road Property. (*Id.*) He was also alleged to have used Company property and
2   assets for business in which he has a personal interest, engaging in actions beyond his
3   authority, and "exercising, improperly, fraudulently, and in bad faith, Dee Sign's
4   purported rights" under the buy-out provision. (*Id.*) Accordingly, it sought injunctive
5   relief and compensatory and punitive damages. (*Id.* ¶¶ 34-36).

6        B.  Elements

7        In Ohio, the elements of breach of fiduciary duty are: (1) the existence of a duty
8   arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury
9   proximately resulting therefrom. *Saxe v. Dlusky*, No. 09AP-673, 2010 WL 4324198,
10  at *5 (Ohio Ct. App. Nov. 2, 2010); *see also Strock v. Pressnell*, 527 N.E.2d 1235,
11  1243 (Ohio 1998).

12       C.  Discussion

13       Huenefeld suggests that it is "dubious" that Champion can assert a breach of
14  fiduciary duty claim against Huenefeld. (Mot. at 11).  It argues that the Ohio statute
15  does not establish a fiduciary relationship between a member of an LLC and an owner
16  or officer of another member. (*Id.*)  However, it also acknowledges that members and
17  managers owe duties of loyalty and care to the company and other members. (*Id.*)
18  Champion asserts that managers of limited liability companies owe fiduciary duties to
19  both the company and its members. (Opp'n at 13 n.5).  Examination of Ohio law
20  reveals that, unless otherwise provided, a manager owes fiduciary duties to "act in good
21  faith, in a manner the manager reasonably believes to be in or not opposed to the best
22  interests of the company, and with the care that an ordinarily prudent person in a
23  similar position would use under similar circumstances."  OHIO. REV. CODE
24  § 1705.29(B).  A manager of an LLC who is a member or is a representative of a
25  member owes to the LLC and the other members only the duties that would be owed
26  by the member. OHIO. REV. CODE § 1705.282.  Members owe to the LLC and other
27  members fiduciary duties of loyalty and due care. OHIO. REV. CODE § 1705.281. The
28  statute imposes limitations on the duties of loyalty and care owed. *Id.*  Despite the

13cv196

1   suggestion of dubiousness, Huenefeld does not appear to dispute that he owes duties
2   as a manager, and provides no authority for a claim that he would not owe duties as a
3   result of his role in Dee Signs.  It is apparent that Huenefeld has not demonstrated he
4   is entitled to summary judgment on the basis that he does *not* owe any fiduciary duties.
5   This Court does not make any findings that any particular statute imposes fiduciary
6   duties on Huenefeld.

7         Troublingly, the parties provide little support for their arguments regarding the
8   breach of fiduciary duty.  Huenefeld claims that depositions have revealed that the
9   fiduciary duty claim is based on the theory that Huenefeld was required to reduce the
10  rent on the Allen Road Property. (Mot. at 11).  Huenefeld asserts that "[t]here is no
11  legal support for Champion's assertion that Mr. Huenefeld had a fiduciary duty to
12  renegotiate the agreed-upon rent set forth in the Second Amendment, particularly
13  retroactively." (*Id.* at 12).  Huenefeld points to the fact that Johnson has a graduate
14  degree in real estate finance, was assisted by experts, and negotiated and agreed to the
15  rent. (*Id.*)  Huenefeld then asserts that the rent was resolved in order to avoid disputes
16  about the rent.  (*Id.*).

17        However, Huenefeld cites to no authority regarding the obligations owed in this
18  circumstances.  He simply asserts that there is no authority to support a breach of
19  fiduciary duty claim on these grounds.  The Court notes that the Opposition also
20  provides little authority regarding even basic obligations imposed by a fiduciary duty.

21        E. Conclusion
22        Summary judgment is appropriate when "there is no genuine dispute as to any
23  material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.
24  P. 56(a); *see also Anderson,* 477 U.S. at 247-48.  The moving party has the initial
25  burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress*
26  *& Co.*, 398 U.S. 144, 153 (1970).  In the case at hand, it appears that many of the
27  relevant factual circumstances are largely settled.  The case would thus appear to be
28  potentially ripe for a determination on summary judgment.

13cv196

1      Here, however, the briefing of the parties does not permit this Court to determine
2  whether the movant is entitled to judgment as a matter of law.  This case poses a
3  complex and non-obvious question regarding the fiduciary duties of a manager.  It
4  involves an existing deal negotiated by sophisticated parties, prior to the official
5  formation of the LLC.  The parties negotiated the deal knowing that Huenefeld was the
6  sole owner of Hotel Burnet, and agreed to make him the manager of the LLC after the
7  deal was executed.  However, the facts asserted indicate the possibility that the
8  Company might have obtained a favorable renegotiation, but that Huenefeld would not
9  agree to an alteration.  There is obvious potential for a conflict of interest where a
10  manager is asked to take actions which would harm the manager's personal financial
11  interest in a way not shared by the company.
12      What is not at all obvious is whether his actions were therefore inappropriate
13  under Ohio law.  Huenefeld provides no support for its claim that these actions do not
14  violate his fiduciary duty.  Although there may well be no authority precisely on point,
15  Huenefeld offers no authority whatsoever.  The entire argument, spanning one-and-a-
16  half pages, cites four authorities, two for the elements of the cause of action, one for
17  the general proposition that members and managers owe duties of loyalty and care, and
18  one citation to the standard for duty of care. (Mot. at 11-12).  There is no citation to
19  the duty of loyalty, despite the nature of the controversy, and no discussion of cases
20  from any jurisdiction on the obligations imposed by fiduciary duty.  Instead of
21  providing any legal argument, Huenefeld challenges the nonmoving party to provide
22  authority.  Huenefeld does respond to Champion's arguments in the Reply, and makes
23  a single citation to a very general statement about freedom of contract in Ohio.  (Reply
24  at 3-5).  Although Huenefeld argues that Champion has not established a genuine
25  dispute, the moving party bears an initial burden of showing that there is no genuine
26  dispute of material fact.  In many circumstances, a party may require very little citation
27  to legal authority to meet its minimum burden and permit a court to reach a conclusion
28  about the law and the materiality of the facts asserted.  Here, however, this Court

cannot determine whether the facts in dispute are material based on briefing.  This Court declines to expend scarce judicial resources on learning a complex area of Ohio law and considering possible authority when the moving party offers no more than conclusory assertions that his conduct does not violate a fiduciary duty.  Summary judgment is therefore **DENIED** as to the breach of fiduciary duty cause of action.

## II.  Conversion

### A. Allegations

In the FAC, Champion asserted that, as a Member of the Company, it is entitled to the "use and benefit" of the monies Huenefeld "paid to himself" in the form of excess rent.   (FAC ¶ 38).   Huenefeld was alleged to have "wrongfully and intentionally" obtained the benefit and possession of the money, and converted it to his own use. (*Id.* ¶ 39).  Champion claimed that it suffered general and consequential damages as a proximate result of the conduct, and claims that it is entitled to exemplary and punitive damages.  (*Id.* ¶¶ 40-41).  Champion elaborates on its theory in its Opposition, asserting that Huenefeld "took for his own financial benefit (and in violation of the fiduciary duties owed to Champion and the [Company]) money that belonged to the [Company] (and therefore to the Company's Members including Champion) in the form of excess rent payments and property tax overcharges." (Opp'n at 15).

### B. Elements

Conversion is the "wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 551 N.E. 2d 172, 175 (Ohio 1990).

### C. Discussion

Huenefeld argues that he did not  "exercise dominion" over the rent, as it was paid by the Company to Hotel Burnet. (Mot. at 12).  Similarly, he states that he has never held the rent, much less held it under a claim inconsistent with Champion's

1  rights. (*Id.* at 13). Huenefeld asserts that he did nothing "wrongful" because
2  Champion negotiated and agreed to the amount of rent. (*Id.* at 12-13). The Court need
3  not address these arguments, as it determines that Huenefeld is entitled to summary
4  judgment on the grounds that Champion did not have the required interest in the money
5  used to pay the rent.

6         Huenefeld asserts that the Company, and not Champion, owned the money used
7  to pay the rent. (*Id.* at 13). Champion concedes that it did not own the rent paid, but
8  argues that it had a "clear and direct interest in such funds" because it was one of only
9  two members of the Company. (Opp'n at 15). Champion cites, without explanation,
10 to two cases applying Ohio law for the proposition that this interest is sufficient. This
11 Court has examined the citations.

12        In *McCaughey v. Garylyn Shelton Inc.*, 208 Fed. App'x 427, 435 (6th Cir. 2006),
13 the Sixth Circuit concluded that, under Ohio law, a "plaintiff need not possess absolute
14 ownership of the property in order to maintain an action for its conversion. It is
15 generally sufficient if the plaintiff possesses some interest in the property and has
16 possession or immediate right to possession." *Id.* (quoting *Preston Trucking Co., Inc.*
17 *Frontier Div. v. Lindamood*, No. CA86-12-076, 1987 WL 18758, at *2 (Ohio Ct. App.
18 Oct. 19, 1987)) (internal formatting and quotation marks omitted). Huenefeld points
19 out that this requires not only an interest, but "possession or immediate right to
20 possession," and that Champion never had an immediate right to possession of the rent.
21 (Reply at 5).

22        Champion also cites to *Kimco Leasing Co. v. Wilson*, 383 B.R. 678 (N.D. Ohio
23 Bankr. 2007). In *Kimco Leasing*, a federal bankruptcy court applying Ohio law
24 examined an allegation of conversion where a creditor had leased office furniture to a
25 debtor, then demanded the return of the furniture upon debtor's default on the lease.
26 *Id.* at 680. The debtor failed to properly account for the furniture. *Id.* The court found
27 that the creditor was "necessarily correct" regarding conversion. *Id.* It then noted that
28 conversion serves to "protect one having an ownership interest or other superior right

1  in property against the derogation of that right by another having an inferior interest
2  in the property." *Id.* at 681.  As the lessee had only a present right of possession and
3  ownership remained in the lessor, a lessee who acted in derogation of ownership rights
4  becomes liable for conversion.  *Id.*  Huenefeld points out that there was no question
5  that the lessor had an interest by way of ownership, and argues that this does not
6  support Champion's position. (Reply at 6).

7         Examination of the cases reveals that the complaining party need not have a
8  complete and absolute right to the property.  In the case at hand, however, the question
9  is not whether Champion only had a limited interest in the property.  The rent money
10 paid was "owned" by the Company.  The question is whether Champion's interest in
11 the Company means that Champion can bring a claim for money converted from the
12 Company.

13        This Court determines that Champion cannot bring this claim on its own behalf.
14 It is undisputed that the funds allegedly converted belonged to the Company.
15 Champion's interest in the LLC gives it a stake in the outcome of a conversion claim,
16 but it does not mean that Champion possessed, or had an immediate right to possession
17 of the Company's funds.  If improperly converted from the LLC, the damages would
18 properly be owed to the LLC, which might not distribute them to Champion.
19 Champion does not purport to bring the claim on behalf of the Company.  Accordingly,
20 the motion for summary judgment is **GRANTED** as to conversion.

21 III.  Fraudulent Misrepresentation

22        A. Allegations

23        Champion alleged that Huenefeld, on behalf of the Company, delivered a
24 "purported Capital Call." (FAC ¶ 43).  It alleged that, subsequent to an extension of
25 the deadline from December 14 to December 21, Huenefeld and Champion had "no
26 fewer than eight meetings and/or email communications during which they continued
27 to discuss both the Company's budgetary issues and Ohio rental issues." (*Id.* ¶¶ 44-
28 45).  Champion alleged that, during these communications, "Huenefeld represented to

Champion that he agreed to further continue the December 21, 2012, deadline so that the parties could continue to negotiate in good faith." (*Id.* ¶ 45). They alleged that Huenefeld "had no intention of abiding by his representations to negotiate in good faith and to further continue the December 21, 2012, deadline when he made them." (*Id.* ¶ 46). Huenefeld was alleged to have made the representations "solely for the purpose of inducing Champion not to provide money to the Company in accordance with the Capital Call so they could improperly exercise the buy-out provisions . . ." (*Id.* ¶ 47). Champion then asserted that it reasonably and in ignorance of the falsity of the representation, did not provide the money. (*Id.* ¶ 48). Champion alleged that it has suffered general and consequential damages as a proximate result of the conduct, and claims that it is entitled to exemplary and punitive damages. (*Id.* ¶¶ 49-50).

### B. Elements

Fraudulent misrepresentation requires 1) a representation, or where there is a duty to disclose, concealment of a fact; 2) which is material to the transaction at hand; 3) made falsely, with knowledge of falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.*, 462 N.E. 2d 407, 409 (Ohio 1984).

### C. Discussion

Huenefeld asserts that there is no evidence that Huenefeld ever represented to Champion that the capital call deadline would be continued. (Mot. at 13). He also claims that there is no evidence that Champion justifiably relied on the representation or that Champion suffered injury proximately caused by the representation. (*Id.*)

#### i. Representations

Huenefeld points to several pieces of evidence in support of his claim that he never made representations. In particular, he points to deposition testimony from Johnson in which Johnson asserts that the action was fraudulent because he was not

1    acting in the Company's best interest. (*Id.* at 13-14; Johnson Depo. at 81:17-20).

2    When asked if Huenefeld concealed anything from him, Johnson responded "I don't

3    understand how that's relevant." (Johnson Depo. at 81:21-22). Huenefeld also points

4    to the December 21, 2012 letter from Champion to Huenefeld, in which Champion

5    states that it "hereby votes NO to the request to make an additional Capital Call" and

6    explains why it believes that "a capital call is not in the best interest of the Company

7    or its Members." (Huenefeld Decl., Ex. F). Huenefeld states that he reminded Johnson

8    that December 21 was the capital call due date. (Mot. at 16). He asserts that no

9    reasonable jury could return a verdict of fraudulent misrepresentation.

10          Champion points out that a claim for fraud can be based on both an actual and

11   an implied representation. (Opp'n at 16); *Funk v. Durant*, 799 N.E. 2d 221, 224 (Ohio

12   Ct. App. 2003); *Block v. Block*, 135 N.E. 2d 857, 865 (Ohio 1956). Champion's

13   Opposition does not assert that Huenefeld ever affirmatively and clearly stated that the

14   deadline would be extended. Rather, it argues that Huenefeld "implicitly represented"

15   by his conduct during negotiations that the parties would continue negotiating in good

16   faith and that he would not enforce any buy-out rights. (*Id.*) They point to the fact that

17   Huenefeld never raised the possibility of exercising his buy-out rights. (*Id.*) It also

18   argues that he continued to negotiate with Champion and its agents in order to resolve

19   the disputes, and continued to represent that the parties could resolve the issue,

20   including on December 19, 2012. (*Id.* (citing Hawkins Decl., Ex K; Johnson Decl.

21   ¶ 12)).

22          Huenefeld has not demonstrated that reasonable jury could not find that, under

23   all of the facts, that Huenefeld made implied misrepresentations that good-faith

24   negotiations would continue. Although the buy-out rights were not specifically

25   discussed and Champion does not appear to allege clear, affirmative

26   misrepresentations, a reasonable jury could credit Champion's arguments and find that

27   Huenefeld led Champion to believe that negotiations would continue if the money were

28   not paid. Huenefeld has not shown that this is necessarily inconsistent with the letter.

1    To be clear, this Court is not determining that a reasonable jury must or is likely to find

2    that Huenefeld made an implied misrepresentation. Rather, the undisputed evidence

3    is insufficient to grant summary judgment for Huenefeld.

4              ii. Reliance

5              Champion argues that its reliance on the implied misrepresentation was

6    reasonable and justified, given the prior informal treatment of capital calls and the fact

7    that a buy out had never been raised before, even when Dee Sign had been late on an

8    earlier payment. (Opp'n at 16-17; Johnson Decl. ¶¶ 12-13; Hawkins Decl., Ex G.).

9    They argue that without "Huenefeld's scheme to lull Champion into a state of false

10   security, the Capital Call would have been made and this entire situation (and

11   Champion's damages) would have been avoided." (Opp'n at 17). Champion argues

12   that reliance is a question of fact, not suitable for summary judgment, and that there is

13   evidence showing that Champion would have delivered the capital call amount, but for

14   the misrepresentations. (*Id.*) Specifically, it points to the fact that it delivered the

15   capital call amount "immediately" after receiving the buy-out notice. (*Id.*) Champion

16   also disputes the significance of the December 21 letter. (*Id.* at n. 6). It argues that the

17   letter was written with the understanding that a buy out was not on the table, and that

18   the letter does not allow Huenefeld "to wash his hands of his prior misrepresentations."

19   (*Id.*) It alleges that it was damaged because it was required to bring an action. (*Id.* at

20   18).

21             Huenefeld argues that the letter shows why Champion did not make the capital

22   call, and that the decision not to make the capital call was not due to the alleged

23   misrepresentation. (Reply at 6-7). He further contends that Champion's assertions

24   amount to an argument that Huenefeld did not explain to Champion the options

25   available to Dee Sign, and asserts that he had no legal duty to disclose that he would

26   follow the Operating Agreement. (*Id.* at 7).

27             Huenefeld has also failed to demonstrate that a jury could not reasonably

28   conclude that Champion reasonably and justifiably relied on any implied

1  misrepresentation.  The fact that Champion delivered the capital call amount after
2  receiving the buy-out notice could support a finding that Champion did not pay the
3  amount earlier in reliance on the understanding that the buy-out provision was not in
4  play.  Further, although Champion attacks Johnson's statement that he would have
5  caused Champion to make the capital call had he known Huenefeld would seriously
6  consider exercising the buy-out rights as "revisionist history," a reasonable jury might
7  decide to credit the statement.  (Reply at 7-8).  Finally, careful review of the letter
8  reveals that it is not necessarily inconsistent with Champion's claims, and a reasonable
9  jury could conclude that it was sent based on a belief that buy-out rights would not be
10  exercised.

11          iii.  Future Conduct

12          Finally, Huenefeld argues that "fraud cannot be predicated on promises or
13  representations related to future actions or conduct."  (*Id.* at 7 (citing *Tibbs v. Nat'l*
14  *Homes Constr. Corp.*, 369 N.E. 2d 1218, 1222 (Ohio Ct. App. 1977))).  This argument
15  was raised for the first time in the Reply brief.  It is inappropriate for a court to
16  consider new arguments that a party failed to assert in an opening brief.  *E.g., Ass'n of*
17  *Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal.
18  2006) ("It is inappropriate to consider arguments raised for the first time in a reply
19  brief."); *United States ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal.
20  2000) ("It is improper for a moving party to introduce new facts or different legal
21  arguments in the reply brief than those presented in the moving papers."); *Schwartz v.*
22  *Upper Deck Co.*, 183 F.R.D. 672, 682 (S.D. Cal. 1999) (citing *Provenz v. Miller*, 102
23  F.3d 1478, 1483 (9th Cir. 1996)).  *See also State of Nev. v. Watkins*, 914 F.2d 1545,
24  1560 (9th Cir. 1990) (applying the rule at the appellate level and discussing the
25  unfairness to opposing party of considering issues raised for the first time in a reply
26  brief).

27          Even if appropriate for this Court to consider, this argument would not support
28  summary judgment in this case.  Examination of the authority cited reveals that the

1   Court of Appeals of Ohio stated that it is "generally true that fraud cannot be predicated
2   on promises or representations relating to future actions or conduct . . ." *Tibbs*, 369
3   N.E. 2d at 1222 (citation omitted). However, the *Tibbs* Court clarified that a fraudulent
4   misrepresentation may be committed where someone "makes a promise of future
5   action, occurrence, or conduct, and who at the time he makes it, has no intention of
6   keeping his promise." *Id.* at 1223. In such a case, the misrepresentation of the existing
7   fact is found in the lie as to his "mental attitude and present intent." (*Id.*) As
8   Champion alleges that Huenefeld was carrying out a scheme to lull Champion into a
9   false sense of security, this Court cannot determine, based on the authority given and
10  undisputed facts provided, that Champion cannot prevail in persuading a reasonable
11  jury that Huenefeld misrepresented an existing fact.

12      D.  Conclusion

13      After review of the evidence, and the argument of the parties, this Court cannot
14  conclude as a matter of law that Huenefeld is entitled to summary judgment. Summary
15  judgment is therefore **DENIED** as to fraudulent misrepresentation.

16  IV.  Negligent Misrepresentation

17      A.  Allegations

18      Champion restated its allegations regarding the negotiations and the capital call.
19  It claimed that Huenefeld represented "that he agreed to further continue the December
20  21, 2012, deadline so that the parties could continue to negotiate in good faith." (FAC
21  ¶ 54).  Huenefeld was alleged to have had "no intention of abiding" by his
22  representations and "knew or should have known that his representations would cause
23  Champion to change its position and to not provide money to the Company pursuant
24  to the Capital Call." (*Id.* ¶ 55).  Champion alleged that Huenefeld made his
25  representations solely to induce Champion not to provide money in accordance with
26  the capital call in order to exercise the buy-out provisions, or, in the alternative, that
27  Huenefeld "knew or should have known" that his representations would induce
28  Champion not to provide the money. (*Id.* ¶ 57). As above, Champion claimed to have

1   reasonably relied on the representation and suffered damages as a result. (*Id.* ¶¶ 58-

2   59).

3       B. Elements

4       In Ohio, the elements of negligent misrepresentation are as follows:

5       One who, in the course of his business, profession or employment, or in
        any other transaction in which he has a pecuniary interest, supplies false
6       information for the guidance of others in their business transactions, is
        subject to liability for pecuniary loss caused to them by their justifiable
7       reliance upon the information, if he fails to exercise reasonable care or
        competence in obtaining or communicating the information.

8
    *Delman v. City of Cleveland Heights*, 534 N.E. 2d 835, 838 (Ohio 1989) (emphasis
9
    removed) (citations omitted) (quoting 3 RESTATEMENT (SECOND) OF TORTS (1965)
10
    126-27, § 552(1)).
11
        C. Discussion
12
        Huenefeld relies on many of the arguments above. He states that he did not
13
    supply false information, and that Champion failed to make its capital contribution
14
    because of the reasons in the letter, and not in reliance upon anything Huenefeld may
15
    have stated. (Mot. at 16). Huenefeld also points to a provision in the Operating
16
    Agreement that prevents Champion from maintaining a claim for ordinary negligence
17
    against him. (*Id.* (citing Huenefeld Ex. A § 11.2)). Champion generally relies on the
18
    same responses it asserted with respect to fraudulent misrepresentation. (Opp'n at 16-
19
    18).
20
        For the same reasons stated above, Huenefeld has not demonstrated that a jury
21
    could not find that Huenefeld impliedly misrepresented information and that Champion
22
    reasonably and justifiably relied on the representation. The Court specifically notes
23
    that Huenefeld does not attempt to argue that the standards for the two claims are
24
    different with respect to what constitutes a misrepresentation or sufficient reliance.
25
    The Court also notes that although Huenefeld states that Champion cannot maintain an
26
    ordinary negligence action against him, he does not clearly assert that this precludes
27
    this negligent misrepresentation claim, much less offer support for that conclusion.
28
    (Mot. at 16).

13cv196

### D.  Conclusion

Accordingly, summary judgment is **DENIED** as to negligent misrepresentation.

### CONCLUSION

Based on the foregoing, the Motion for Summary Judgment is **GRANTED** with respect to the claim for conversion.  The Motion is **DENIED** as to the claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation.

**IT IS SO ORDERED**.

Dated: June 20. 2014

HON. ROGER T. BENITEZ
United States District Judge

- 22 -

13cv196