UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMPION SIGNS, a California limited liability company,<br><br>                                   Plaintiff,<br><br>v.<br><br>DEE SIGN CO., an Ohio corporation; and BRADEN R. HUENEFELD, an individual,<br><br>                                   Defendant. | Case No.: 13CV0196-BEN-JLB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| DEE SIGN CO., an Ohio corporation; and BRADEN R. HUENEFELD, an individual,<br><br>                                   Counterclaimants,<br><br>v.<br><br>CHAMPION SIGNS, a California limited liability company,<br><br>                                   Counterdefendant. | |

The declaratory relief and specific performance claims were tried to the Court.[1] For the reasons set forth below, the Court finds in favor of Defendant Dee Sign Co. ("Dee Sign") and orders specific performance. Plaintiff Champion Signs LLC ("Champion") must sell its Membership Interest in Dee Sign USA, LLC ("the Company") to Dee Sign for $572,598.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

### I. Summary

Champion and Dee Sign are the only two Members of the Company, formed in 2009. Braden Huenefeld, the Authorized Representative of the Lead Manager, Dee Sign, handles day-to-day management of the Company. In 2012, the Company was struggling financially and was in need of additional capital from the Members. Huenefeld issued a formal Capital Call on November 27, 2012, seeking Additional Capital Contributions from the Members. Section 4.2(b) of the Company's Operating Agreement ("OA") allows either Champion or Dee Sign to call on all members to contribute additional capital if the funds are needed to meet the Company's obligations. The OA also details the requirements for a Capital Call and the options if a Member does not consent to the Capital Call or make its Capital Contribution, including triggering the buy-sell proceedings Dee Sign invoked here.

Champion seeks a declaration that Dee Sign did not have the right to buy-out Champion's interest. Dee Sign seeks the contrary and specific performance—sale of Champion's interest in the Company to Dee Sign for $572,598. Although addressed in detail below, the resolution here is rather simple. Dee Sign followed the OA from its issuance of a formal Capital Call to its Buy-Out Notice. Champion did not. Champion had the right to withhold its consent to the Capital Call, but doing so had consequences

---

[1] The tort claims were tried to a jury. The trial was not bifurcated.

[2] In making findings of fact, the Court does not specifically note all of the evidence relied on. Rather, the Court notes the evidence the Court found most critical. The parties agree that, pursuant to the OA, Ohio law applies.

under the OA—it allowed Dee Sign to trigger buy-sell proceedings. And then Champion refused to follow the buy-sell provisions of the OA to challenge the price proposed by Dee Sign in the Buy-Out Notice. Additionally, no equities favor Champion. There is nothing unfair about requiring sophisticated business people that enter into an agreement to follow that agreement. A failure to do so should not be excused to the detriment of the party that *did* follow the agreement. Because the Court finds Dee Sign complied with the OA, Dee Sign is entitled to buy out Champion's interest for $572,598.

## II. Dee Sign USA, LLC

Champion and Dee Sign formed the Company as an Ohio limited liability company with Dee Sign holding a 51% interest and Champion holding a 49% interest. Under the OA, Dee Sign is the Lead Manager with control of the day-to-day management of the business and Champion is the Co-Manager. Braden Huenefeld is designated as Dee Sign's Authorized Representative and Mark Nicol is designated as Champion's Authorized Representative, although the evidence at trial reflected that Ron Johnson primarily handled Champion's interest in Dee Sign on behalf of Nicol.

The Court notes that the testimony at trial reflected that Huenefeld, Nicol, and Johnson are all experienced business people that made informed decisions with the assistance of counsel in the formation of the Company under the OA. The Court was not persuaded that anyone was being taken advantage of, or manipulated, or that the terms of the OA were unfair to either Member.

## III. Capital Call

"[I]f the Company requires cash to meet its obligations," Section 4.2(a) of the OA allows the Lead Manager or Co-Manager to "make a call for each existing Member to make an Additional Capital Contribution (a "Capital Call")" by written notice."[3] The Notice must be given at least 15 days before the Capital Call due date, identify the total

---

[3] The Court notes that "Additional" distinguishes contributions made pursuant to a capital call after formation of the Company from "Initial" capital contributions made under Section 4.1 concurrent with the execution of the OA and formation of the Company.

additional capital needed, and specify each Member's individual capital contribution amount based on the member's interest.

During the time period at issue, despite prior cost-cutting measures, the Company was struggling financially as a result of decreased demand for its products. The Company manufactures real estate signs. The Company needed $150,000 to meet its financial obligations. Dee Sign gave the required written notice more than 15 days before the due date. The November 27, 2012 Capital Call Notice identified the total amount needed and each Member's contribution amount based on its interest—$76,500 from Dee Sign and $73,500 from Champion. The original December 14, 2012 due date was extended once to December 21, 2012.

### A.     Capital Call Due Date

Champion suggested at trial that it was misled into believing the Capital Call deadline was extended or otherwise not a factor because of lease negotiations and discussions about utilizing shareholder loans instead of capital contributions. Johnson was pushing Huenefeld to lower the rent for the Allen Road property that housed the bulk of the Company's operations.[4] The implied extension or elimination of the deadline was a basis for Champion's fraud and negligent misrepresentation claims tried to the jury. However, the Capital Call deadline is significant for purposes of the validity of the Capital Call as well because Champion unsuccessfully attempted to make a $73,500 payment a week after the December 21, 2012 deadline.[5]

The Court finds that the Capital Call deadline was not extended beyond December 21, 2012. The parties were negotiating lease terms up to the deadline, but for a number

---

[4] The lease for the Allen Road property was negotiated and assumed by the Company as part of the Company's formation. The property was leased from Hotel Burnet and Huenefeld owned Hotel Burnet. This was known to all involved. The claims tried to the jury largely focused on whether Huenefeld breached any duties to Champion by not reducing the rent on the Allen Road property as demanded by Champion. The jury found that Huenefeld did not breach a fiduciary duty to Champion.

[5] It is not entirely clear if Champion is advancing this same argument as to the declaratory relief, however, the Court finds it prudent address it. The deadline is important in assessing compliance with the OA.

of reasons, it is evident that no additional extensions were given or even implied.

First, Dee Sign reminded Champion of the December 21, 2012 deadline in an email on December 21, 2012. Champion claimed this reminder, shortly after 1:00 p.m., was an attempt to reestablish the December 21, 2012 deadline at a time when Champion could not comply with it (Champion argued it was too late in the day to wire the money). But, when Johnson responds to this email on behalf of Champion a few hours later, he does not protest that he thought the deadline had been extended or otherwise suggest that December 21, 2012 was not the deadline. Instead, in his first response he comments that it is unfortunate they could not reach a resolution and wishes Huenefeld a good weekend. Then, that evening, he sends another email reiterating again that Champion does not consent to the Capital Call and attaching a letter that itself acknowledges the initial and extended December 21, 2012 deadline. The idea that the deadline had somehow been impliedly extended or was no longer applicable seemed to occur later as a basis for the fraud and negligent misrepresentation claims.

Second, none of the communications between the parties suggest the deadline was being extended. On the contrary, the parties' email communications, including references to "final" offers on December 21, 2012, reflect that the parties' negotiations were concluding. The parties were settling into their respective final positions in anticipation of the deadline. Viewing all the evidence concerning the lease negotiations, it is apparent that Champion was attempting to get the Allen Road lease rate reduced as a condition of Champion paying its share of the capital needed by the Company and sought through the Capital Call. In essence, Champion was using its Capital Contribution to the Company and the Company's need for money to force Huenefeld to lower the rent on the Allen Road facility. During the December 19, 2012 conference call, there is speculation about whether the Bank[6] would authorize shareholder loans instead of capital

---

[6] The Company had a line of credit and a note with Fifth Third Bank. The Company's terms with the Bank precluded the Company from making any distributions of capital to the Members without express written consent from the Bank.

contributions and lengthy discussions of the lease.  But, there is no suggestion in any of these negotiations that the Capital Call deadline might change.

Third, the prior extension from December 14, 2012 to December 21, 2012 was for a specified new date.  On December 12, 2012, as a result of Champion's request to postpone the shareholder meeting, Huenefeld extended the deadline from December 14, 2012 to December 21, 2012 in an email to Nicol, Johnson, and Joe Kolks, the Company's Chief Financial Officer.  It would be odd to conclude a deadline was impliedly extended indefinitely when the prior extension was explicitly given to a specific date.

The Court finds that the deadline for the Capital Call was December 21, 2012.

### B. Champion Did Not Consent to the Capital Call

Champion did not consent to the Capital Call.  This is significant because, under the OA, when Super Majority Consent to a Capital Call is not obtained, as it could not be without Champion's 49% interest consenting, Section 4.2(b) applied.[7]  Although there was a great deal of testimony about lease negotiations leading up to the Capital Call deadline, Johnson testified that Champion never consented to the Capital Call.  Champion reiterated its lack of consent numerous times verbally and in writing, including on the Capital Call due date.  The Court finds that Champion did not consent to the Capital Call.  Accordingly, Section 4.2(b) applied.

## IV. Section 4.2(b)

Section 4.2(b)[8] provides two ways that a Member can proceed when the other Member does not consent to the Capital Call:[9] (1) loan the Company the non-consenting

---

[7] Section 4.2(a) provided that "[i]f the Members do not give Super Majority Consent to a Capital Call, then Section 4.2(b) will apply."

[8] The Court finds Section 4.2(b) applied.  It outlines in detail the procedures to follow for a Capital Call, including the requirements if Super Majority Consent is lacking.  However, to the extent that Section 7.4 applied, Champion did not follow that provision either.  Under Section 7.4, when Major Decisions cannot be resolved through good faith negotiations, a Member can request mediation.  Champion did not make this request.

[9] If the Member elects not to pursue either option, then the Company must return that Member's Capital Contribution.

member's ("Non-Advancing Member") contribution amount; or (2) trigger buy-sell proceedings. However, before pursuing either option, the Member that consents (the "Advancing Member") must make its own capital contribution. The Advancing Member must "make[] the Additional Capital Call" before proceeding to a loan or triggering the buy-sell. [10]

### A. Dee Sign's Capital Contribution

While there is no dispute that Dee Sign made a $76,500 payment to the Company on December 10, 2012—shortly before the December 14, 2012 deadline that had not yet been extended—there was conflicting evidence as to whether the payment was a capital contribution or a shareholder loan. It is Champion's position that Dee Sign's $76,500 payment was a shareholder loan. Champion argues that because it was recorded internally as a shareholder loan and the parties discussed the possibility of shareholder loans, it was a shareholder loan. Dee Sign argues it was a capital contribution and only mistakenly recorded as a shareholder loan.

Champion relies primarily on the classification of the payment as a shareholder loan in internal financial records, internal communications about its classification, and discussions between Johnson and Dee Sign about the possibility of shareholder loans in lieu of capital contributions.

The Court heard testimony that the parties discussed the advantages of shareholder loans over capital contributions and there were advantages. A member loaning money to the Company was more likely to get the money back and get it back more quickly than a member would with a capital contribution. Johnson testified that shareholder loans had been made in the past in lieu of capital contributions for this reason. This is consistent with references during the December 19, 2012 conference call to both members' prior loans to the Company for the purchase of equipment. Those loans were being repaid.

---

[10] The parties agree that Dee Sign making its Capital Contribution was a condition precedent to Dee Sign's right to issue the Buy-Out Notice. (Def.'s Post Trial Supplemental Brief [Docket No. 94] at 13-14; Pl.'s Supplemental Brief [Docket No. 95] at 1.)

Johnson, Huenefeld, and Kolks, in particular, were cognizant of the distinction because Johnson had been advocating for shareholder loans over capital contributions. Johnson never commits to making the payment because he is trying to leverage a rent reduction on the Allen Road facility, but he does indicate that any contributions of additional cash should made through loans rather than capital contributions if it is possible. However, Johnson's conditioning Champion's payment on this approach and advocacy for this approach for Dee Sign's contribution does not unilaterally convert a payment that had already been made in response to a formal Capital Call into a shareholder loan. At no time does Huenefeld indicate Dee Sign's Capital Contribution will be treated as a shareholder loan. In fact, Huenefeld is very skeptical that the Bank would approve shareholder loans. Additionally, the Court heard testimony from Kolks that capital contributions were better for the Company because capital contributions create more equity while loans are a liability on the Company's balance sheet.

The only persuasive evidence that the $76,500 was a shareholder loan was its classification as such in the Company's internal financial records. The classification was adjusted to a capital contribution by the Company's outside auditor, VonLehman & Company, Inc. The Company's audited financial statements for 2012 reflect that it was a capital contribution. The correction is consistent with Dee Sign's Capital Contribution being mistakenly classified as a shareholder loan. The Court was not persuaded that the change was prompted by Dee Sign, as suggested by Champion. Deposition testimony from Nick Shipley, the Manager for the audit, reflected that the classification was changed to a capital contribution after reviewing the OA, communications among the Members, and through consultation with others at VonLehman.[11] Additionally, Kolks testified that the payment was misclassified as a shareholder loan by Dennis Gruber in

---

[11] There was little evidence to suggest that VonLehman was improperly influenced by Dee Sign to change the classification as Champion has argued. Huenefeld testified that he minimized his communications with the auditors about the payment to avoid any accusation of impropriety and Shipley testified that while the auditors communicated with Huenefeld and Kolks, the auditors independently determined the transaction was intended to be a capital contribution.

accounting and changed to a capital contribution by the Company's outside auditor.[12]

There was also significant evidence that the $76,500 payment was Dee Sign's Capital Contribution. First, there is the obvious. A formal Capital Call was made on November 27, 2012. Dee Sign's identified portion was $76,500. On December 10, 2012, four days before the original deadline, still in place at the time, Dee Sign paid $76,500 to the Company. It stands to reason that this was its Capital Contribution, made as requested in the formal Capital Call, prior to the deadline. Additionally, Huenefeld and Kolks testified at trial that the $76,500 payment was Dee Sign's Capital Contribution.

The $76,500 payment was also described as a Capital Contribution numerous times both before and after the Capital Call deadline. Early in a December 19, 2012 conference call, Huenefeld explains that as of that date the Company only had $100,000 in cash after Dee Sign's capital call contribution. Johnson verifies that this contribution has already been put into the Company. Then, after the deadline, Kolks responds to an email from Johnson inquiring about when Dee Sign funded its capital contribution, and indicates that Huenefeld funded the Capital Call on December 10, 2012 in the amount of $76,500. Contrary to Champion's argument, email communications about the payment do not indicate it *is* a shareholder loan. Rather, in response to inquiries from Johnson and Nick Pharo, one of the outside auditors, about where Dee Sign's Capital Contribution was recorded, Kolks and Gruber indicate the payment is booked in shareholder loans. This only reinforces the undisputed fact that it was classified as a shareholder loan for a period of time. It certainly does not mean that Kolks, who had identified it as Dee Sign's Capital Contribution numerous times, believed it was actually a shareholder loan.

Champion's own theory of this case, or at least part of it, also favors the payment being a capital contribution. Champion argued that Huenefeld was displeased with Champion and was perpetrating a fraud on Johnson to try to take back his family

---

[12] Kolks explained that Gruber started with the Company's bank statements and classified the transactions listed on the statements in the Company's internal records.

business, that Huenefeld duped Johnson into thinking there was no deadline for the Capital Call to prevent Champion from meeting the deadline. Why would Huenefeld go to such lengths to mislead Champion and then preclude himself from a buy-out by making a loan instead of a capital contribution? Although, the Court was not convinced that Huenefeld intended to perpetrate a fraud on Johnson, the evidence did suggest that Huenefeld was trying to follow the OA and at least have the option to trigger the buy-sell if Champion failed to make its Capital Contribution. Even before the formal Capital Call Notice was given, Johnson expressed Champion's opposition to putting any additional money into the Company. It stands to reason that Huenefeld would anticipate that position might not change. Huenefeld also sought out a valuation of the Company that was necessary for the buy-out notice before the Capital Call deadline.[13] This further suggests he was aware of the next steps if Champion failed to make its Capital Contribution. The Court finds it unlikely that Huenefeld would risk the opportunity to buy-out Champion, for the possibility that he might be repaid sooner, particularly given the reservations he expressed about the Bank approving repayment of shareholder loans.

    Having considered and weighed the evidence, the Court finds Dee Sign's $76,500 payment was its Capital Contribution.

### B.    Buy-Sell Proceedings

    Once the Capital Call deadline passed without a Capital Contribution from Champion,[14] Dee Sign had the option to trigger the buy-sell proceedings or loan the

---

[13] This too was not as malicious as Champion suggest. As discussed more fully below, Section 4.2(b) requires the Advancing Member to act—make a loan or trigger the buy-sell proceedings—within 30 days of the Capital Call. A buy-out notice must include an amount the Advancing Member offers to pay to buy-out the Non-Advancing Member's interest. It is unlikely that Huenefeld could have obtained any kind of valuation of the Company within the week between the extended Capital Call deadline and 30 days after the Capital Call Notice, particularly given, as Champion emphasized for other reasons, the Christmas holiday fell in this time period.

[14] The absence of a payment was not what triggered Section 4.2(b). Section 4.2(b) was implicated because Champion did not consent to the Capital Call. Even if the Court construed the payment as some sort of implied consent to the Capital Call, it was not given until after Dee Sign has triggered the buy-sell proceedings. It was too late.

Company the amount of Champion's Capital Contribution. Dee Sign opted to trigger the buy-sell proceedings. Under 4.2(b), the Advancing Member may "trigger the buy-sell proceedings under Section 9.3(b)-(d) (except as modified below) . . . by written notice to the Non-Advancing Member (the "Buy-Out Notice")."

The Buy-Out Notice must include a price the Advancing Member will pay to purchase the Non-Advancing Member's interest in the Company. The Non-Advancing Member can accept the price or propose a different price. If the parties cannot agree on a price within thirty days after the Buy-Out Notice is received by the Non-Advancing Member, the parties shall agree on two third-party firms to value the Company and then follow the procedures in Section 9.3(b)-(d) to establish a purchase price. Section 9.3 covers transfers of Members' interests. Section 9.3(b)-(d) also provides for obtaining third-party valuations if the parties do not agree on a price. Section 9.3(b) goes on to provide that the two third-party valuations shall be averaged to arrive at the Appraised Value. This is how the parties agreed to resolve a dispute about the purchase price for a member's interest if buy-out proceedings were triggered under Section 4.2(b).

Here, Dee Sign properly triggered the buy-sell proceedings under Section 4.2(b). The December 26, 2012 Buy-Out Notice proposed that Dee Sign would purchase Champion's interest for $572,598 on January 25, 2013. On January 14, 2013, having not received a different price, Dee Sign even prompted Champion to propose a different price if Champion was not willing to accept Dee Sign's proposed price to allow the parties to move on with the appraisal process. Champion did not propose a different price and has failed to sell its Membership interest to Dee Sign for the price proposed in the Buy-Out Notice.[15]

---

[15] Champion argued that it could not propose a different price or move forward with the appraisal process without conceding the Capital Call and Buy-Out proceedings were proper. However, Champion could not explain why it could not follow those steps while reserving it objections to the propriety of the Capital Call and Buy-Out proceedings.

When presented with the Buy-Out Notice, Champion had only two options under the OA—"accept the stated purchase price or . . . propose a different purchase price." Champion did not propose a different price and refused to sell its Membership Interest to Dee Sign for the stated purchase price. Champion was obligated under the OA to sell its Membership interest in the Company to Dee Sign on January 25, 2013. Champion failed to fulfill its obligations under the OA. Section 9.7(b) of the OA specifically provides that "Members shall be entitled to obtain specific performance of the obligations of other Member(s) under this Article IX." Article IX includes Section 9.3(b)-(d) that Section 4.2(b) invokes for the buy-sell proceedings. The Court finds that Dee Sign is entitled to Champion's specific performance — sale of its interest in the Company for $572,598 — based on Section 9.7(b).[16]

Additionally, Champion waived any right to challenge the purchase price by failing to offer a different price. "Waiver . . . is a voluntary relinquishment of known rights." *Norfolk So. Ry. Co. v. Jacobs*, 549 F. Supp. 2d 990, 1002 (N.D. Ohio 2008) (citing *Automated Solutions Corp. v. Paragon Data Sys.*, 167 Ohio App. 3d 685, 695 (2006)). Waiver may be express or constructive. *Id.* (citing *McMillen v. Willys Sales Corp.*, 118 Ohio App. 20, 27 (1962)). The Company's OA provided the only way to obtain a different purchase price and Champion knowingly refused to follow it. There was no evidence that Champion was unaware of its rights and obligations under the OA.[17] The Buy-Out Notice cited Section 4.2(b) as authority for the Buy-Out and Dee Sign specifically asked for a different price pursuant to the OA on January 14, 2013.

---

[16] The Court notes that absent this provision, Dee Sign would still be entitled to specific performance. An award of specific performance is based on equitable principles. *Green, Inc. v. Smith*, 40 Ohio App. 2d 30, 39 (1974). As discussed more fully below, the equities favor Dee Sign and there is nothing unfair, unconscionable, or oppressive about requiring Champion to fulfill its obligations under the OA.

[17] Champion knew how the OA worked. Johnson told Kolks his initial attempt as a capital call, the informal email capital call, did not comply with the OA. This prompted the formal November 27, 2012 Capital Call Notice. It is hard to believe Champion was not aware of the potential consequences of failing to make its Capital Contribution by the deadline when it had relied on the procedures in Section 4.2(b) to require a formal Capital Call.

Champion knew it had a right to propose a different price and did not. Any right to challenge the purchase price was waived.

## V. Equitable Issues

In addition to the challenges above, Champion asserts a number of arguments that implicate equity principles. Although these issues are intertwined with the arguments above, the Court addresses them separately.

### A. Forfeiture

Champion argues that it should not be required to sell its interest because Dee Sign has not established its entitlement to forfeiture. The Court is not convinced that requiring Champion to sell its interest for $572,598 pursuant to the OA constitutes a forfeiture. However, assuming it does constitute a forfeiture, Dee Sign is still entitled to specific performance.

Champion argues that it would be inequitable to force it to sell its interest because Dee Sign's Capital Contribution was classified as a loan, Champion eventually made its Capital Contribution, the Company used that late payment, the Company sought Nicol's personal guarantee to a bank after Dee Sign attempted to buy out Champion's interest, and Champion was allocated tax liability as a Member following the Buy-Out Notice.

#### 1. Misclassification of Dee Sign's Capital Contribution

Champion argues that because Section 4.2(b) is a forfeiture provision Dee Sign had to strictly comply with it and did not because Dee Sign's payment was initially recorded as a shareholder loan, not a Capital Contribution. Essentially, Champion argues that Dee Sign is not entitled to buy-out Champion's interest because Dee Sign did not perfectly comply with the OA. As noted above, the Court is not convinced Section 4.2(b) is a forfeiture provision, however, assuming it is, the Court finds Dee Sign strictly complied with it. As explained above, the Court was persuaded by the evidence that Dee Sign's payment was simply recorded in the internal records of the Company incorrectly until the outside auditors corrected it. It was contributed in response to a formal and proper Capital Call, it was consistently identified as Dee Sign's Capital Contribution both before

and after the Buy-Out Notice was given, and there was no evidence, other than the inaccurate classification itself, to support the idea it was a loan. As noted above, Johnson's advocacy for loans over capital contributions could not unilaterally convert a Capital Contribution into a loan. Dee Sign strictly complied with Section 4.2(b).

### 2. Champion's Payment

Champion also argues that it would be inequitable to excuse the misclassification of Dee Sign's payment while not excusing Champions belated attempt to make its Capital Contribution. The Court finds the two are starkly different. The Company incorrectly recorded Dee Sign's Capital Contribution as a shareholder loan. As discussed more fully above, the evidence reflects it was a clerical mistake. On the other hand, Champion refused to make its Capital Contribution. Champion was even reminded of the deadline, but did not comply with it.[18] There was no credible evidence Champion's failure to pay its Capital Contribution by the deadline was anything but intentional. It is also clear that Champion's attempt at a late Capital Contribution was not prompted by an unexpected Capital Call deadline. It was prompted by receipt of the Buy-Out Notice. It would not be equitable to allow Champion to refuse to makes its Capital Contribution, wait and see how Dee Sign proceeds (loan the Company Champion's unpaid share, trigger the Buy-Out, or take back its Capital Contribution) and then try to undo it all when faced with a proper Buy-Out.

Additionally, as to the Buy-Out, Champion refused to propose a different price or pursue the appraisal process despite Dee Sign's prompting, and refused to sell its interest. This was also intentional. Dee Sign upheld its obligations under the OA and followed the OA. Champion ignored its obligations under the OA and refused to follow the OA at every turn. The Company's misclassification of Dee Sign's Capital Contribution cannot excuse Champion's refusal to timely make its Capital Contribution. Champion

---

[18] As explained above, the Court finds there was no reason to believe the deadline had been extended. This appears to have been an afterthought.

essentially asks the Court, based on equity, to treat it as if it did everything it intentionally did not do. That would be inequitable.

The handling of the $73,500 payment also does not favor Champion. The $73,500 payment was bounced back and forth until counsel for both parties agreed it would be held without prejudice to either parties' position. Champion's attempt to use the Company's holding of these funds against Dee Sign, given the agreement to do the opposite, is not well taken. After Champion refused to accept a wire transfer sending its late payment back and refused a check from the Company sending the payment back, the parties agreed, at Champion's suggestion, that the funds could be held by one of the parties without it prejudicing eithers' position in this case. The Company did just that, however, Champion argues this Court should hold it against Dee Sign that the funds remained on the Company's books even though those funds were segregated. Even if the Court considered the funds remaining on the Company's books "use" of the funds, its impact on the equities would be negligible and certainly not justify excusing Champion's refusal to sell its interest under the OA.

### 3. Personal Guarantee and Taxes

The Company's request for a personal guarantee from Nicol does not weigh against Dee Sign. The request came from a bank[19] to the Members. Given Champion had refused to sell its membership interest, conveying that request did not constitute any kind of waiver of the buy-out. Although it had violated the terms of the OA to do it, Champion still held a Membership interest in the Company. Similarly, the allocation of taxable income to each Member holding an interest, as Champion did, is not a waiver of the Buy-Out by Dee Sign. The Company's allocation of taxable income to Champion based on an interest it held, wrongful as it was, does not impact Dee Sign's right to buy out Champion. It makes no sense to allow Champion to avoid the Buy-Out because it wrongfully refused to sell its interest and then excuse that violation because it was

---

[19] Huenefeld's testimony indicates the personal guarantee was requested by Chase.

required to fulfill its tax obligations based on an interest it wrongfully held.[20]

## VI. Attorneys' Fees

Section 11.14 of the OA provides that "[i]n the event of any litigation or legal proceeding as a result of any claim or dispute hereunder, except as provided otherwise herein, the prevailing party shall be entitled to recover from the other party the costs and expenses of such litigation or proceeding, including, without limitation, attorneys' fees and expenses at trial and upon appeal." Dee Sign is the prevailing party and is entitled to reasonable attorneys' fees and costs.

## CONCLUSION

The Court finds in favor of Dee Sign and orders specific performance. Champion shall sell is Membership interest in the Company to Dee Sign for $572,598. The Clerk shall enter judgment in favor of Dee Sign in accordance with this order and the jury's May 28, 2015 verdict.

**IT IS SO ORDERED.**

Dated: September 30, 2015

Hon. Roger T. Benitez
United States District Judge

---

[20] In reaching this conclusion, the Court does not address what obligations the parties may have to correct this allocation. The Court only finds it does not constitute a waiver of the Buy-Out or weigh against Dee Sign in consideration of the equities.